[No. C011938. Third Dist. Jan. 28, 1993.]

EMIL G. SHUBAT, as Assessor, etc., Plaintiff and Appellant, v.
SUTTER COUNTY ASSESSMENT APPEALS BOARD NO. 1,
Defendant;
NOR CAL CABLEVISION, INC., et al., Real Parties in Interest and
Respondents.

**COUNSEL**

Darrell W. Larsen, County Counsel, and Ronald S. Erickson, Assistant County Counsel, for Plaintiff and Appellant.

Michael H. Krausnick, County Counsel (Stanislaus) and E. Vernon Seeley, Assistant County Counsel, as Amici Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendant.

Shartsis, Friese & Ginsburg, Douglas Mo and Paul M. Gordon for Real Parties in Interest and Respondents.

## Opinion

PUGLIA, P. J.—Plaintiff Emil G. Shubat, the Sutter County Assessor (Assessor), appeals from the judgment of the trial court denying his petition for writ of administrative mandamus. The Assessor challenges the determination by defendant Sutter County Assessment Appeals Board No. 1 (Board) of the taxable value of real party in interest Nor Cal Cablevision, Inc. (Nor Cal). The Board found a portion of Nor Cal's overall value attributable to nontaxable intangible assets. The Assessor contends this determination is (1) contrary to law and (2) not supported by substantial evidence. We disagree and shall affirm.

I

Effective October 1, 1986, respondent and real party in interest Continental Cablevision, Inc. (Continental) purchased the outstanding shares of several subsidiaries of McClatchy Newspapers involved in the cable television business, including Nor Cal. Nor Cal provides cable television service to residents in both Sutter and Yuba Counties. After certain postsale adjustments, the total purchase price paid by Continental was $127,648,647.

In order to fulfill his statutory obligation to assess property at its full value (Rev. & Tax. Code, § 401), the Assessor reassessed the value of Nor Cal at the time of transfer. The computation of property value normally involves one or more of three general methods of valuation. The "market" approach looks at recent sales of comparable property, including that being valued. (Cal. Code Regs., tit. 18, § 4.) The "income" or discounted cash flow approach looks at the present value of a projected stream of income from use of the property. This present value depends upon not only the magnitude and duration of the projected income stream but the discount rate used. The higher the discount rate the lower the present value of the property. (Cal. Code Regs., tit. 18, § 8, subd. (d).) The third method of valuation, the "cost" approach, looks at the cost of replacing the property less accrued depreciation. (Cal. Code Regs., tit. 18, § 25, subd. (c).)

In computing a total value for Nor Cal, the Assessor used a market approach based on the price paid by Continental. Beginning with the amount reported by Continental as attributable to the purchase of Nor Cal, and making certain adjustments not relevant to this dispute, the Assessor arrived at a total value of $37,872,000.[1] Of this amount, $16,226,260 was allocated to tangible assets, such as land, buildings, equipment and other personal

---

[1] The total assessment was apportioned between Sutter and Yuba Counties to arrive at a taxable value in Sutter County of $19,887,206. There is no dispute regarding the allocation of

property; the remainder was allocated to intangibles. The only intangible identified by the Assessor was Nor Cal's taxable possessory interest in the public rights-of-way for delivery of cable signals, to which the entire residual amount was allocated.

Nor Cal objected to the reassessment and filed an application for reduction.[2] The Board was convened to hear Nor Cal's application. At the hearing before the Board, Nor Cal presented the report and testimony of its expert John E. Kane. Kane used both a market and income approach to arrive at a total value for Nor Cal of $28 million. For the income portion of his analysis, to which Kane assigned the greatest weight, a discount rate of 16 percent was used based on the risk associated with the business and the corresponding cost of capital.[3]

In determining the proper allocation of value among the various assets of Nor Cal, Kane first computed values for the tangible assets. He then used an "excess earnings" method to allocate value to the intangibles. This method required computation of the projected income attributable to the tangible assets by multiplying the total value of such assets by a discount rate of 13 percent, which Kane determined to be an appropriate rate of return based on the lower risk associated with tangibles. This income amount was then subtracted from the total projected income to come up with an income amount attributable to the intangibles.

Kane identified six intangible assets of Nor Cal, to wit: (1) subscriber list, (2) franchise operating rights, (3) a lease (not pertinent to this dispute), (4) assembled work force, (5) noncompetition agreement, and (6) going concern. The second of these, the franchise rights, Kane further subdivided into (1) the right to conduct business, (2) favorable franchise terms, and (3) the possessory interest in the public rights-of-way.

The subscriber list referred to by Kane was actually the subscriber base, i.e., Nor Cal's customers. Using an income approach, Kane determined an income amount appropriate to this asset and applied a discount rate of 16 percent to compute a present value. After subtracting this amount from the

value between the two counties. Although, this appeal involves only the assessment for Sutter County, for the sake of convenience, we shall refer throughout this opinion to the combined value of the various assets of Nor Cal.

[2]The original application was actually filed on behalf of Continental. However, the matter was thereafter prosecuted in the name of Nor Cal.

[3]As explained by Kane, the discount rate fluctuates with the level of risk associated with the property or business. It represents the expected return on investment. The greater the risk associated with the property or business, the greater the return demanded by investors and hence the greater the discount rate. The greater the discount rate, the lower the present value of the asset.

total attributable to intangibles, Kane applied the remaining income to the three franchise rights in equal proportions. Kane then computed a present value for these intangibles using a higher discount rate than that applied to the tangible assets because of the higher risk involved. Nineteen percent was used for the right to conduct business and favorable franchise terms, while twenty percent was used for the possessory interest in public rights-of-way because of the added need to compensate for property taxation of this asset. Through this income valuation method, Kane arrived at values for these intangibles as follows:

| | |
|---|---|
| Subscriber list | $5,202,124 |
| Right to conduct business | $4,272,884 |
| Favorable franchise terms | $4,272,884 |
| Possessory interest in public rights-of-way | $4,059,929 |

Of these amounts, Kane independently computed values for the favorable franchise terms and possessory interest using other methods. The amounts computed corroborated his one-third allocation. The remaining value of Nor Cal was divided among the other intangible assets by various methods, with going concern allocated the residual of $518,155.

The Board generally agreed with the Assessor on total value of Nor Cal. However, the Board agreed with Kane this figure includes certain non-taxable intangibles. After subtracting the value of tangible assets and the subscriber list, the Board arrived at a residual value of $18,242,130. The Board rejected allocation of any value to the noncompetition agreement and determined the favorable franchise terms are inseparable from the right to do business. This left three intangible assets, the possessory interest, the right to do business and the going concern value, to which the Board allocated the residual equally in accordance with the methodology used by Kane. In order to determine final taxable value, the Board added one-half of the present value of future franchise fees to the possessory interest.[4]

The Assessor initiated this proceeding challenging the Board's failure to allocate all residual value to the taxable possessory interest. The trial court

---

[4]Future franchise fees are estimated from projected revenue. These are considered another cost paid for the right to operate Nor Cal. The present value of such future payments is thus computed and added to total value of the system. The Board concluded only half of this amount is attributable to the possessory interest, with the other half attributable to the right to do business.

We note a possible discrepancy in the Board's computation. The Board purported to divide the residual of $18,242,130 by three to arrive at an allocation to the three intangibles. Before addition of one-half the value of future franchise fees to the possessory interest, the Board assigned a value to the three intangibles of $6,072,212. However, one-third of $18,242,130 is

concluded the record substantiated allocation of value to the nontaxable right to do business and going concern. The court further concluded the record adequately supported the specific amounts allocated. However, the court remanded to the Board to answer four questions: "(1) in valuing the 'possessory interest' held by Nor Cal did the Board consider the extent to which the naked 'possessory interest' is enhanced by nontaxable 'intangibles'? (2) what income does the Board ascribe to the 'possessory interest'? (3) in determining the income stream to be ascribed to the 'possessory interest' does the Board impute to the 'possessory interest' any income directly related to nontaxable 'intangibles,' and, if so, to what extent? and, (4) what capitalization rate did the Board rely upon in determining the value of the 'possessory interest,' together with the basis for the utilization of said rate?"

On remand, the Board responded that it had considered the extent to which the possessory interest was enhanced by nontaxable intangibles. In particular, the Board noted all the income allocated to the possessory interest was related to the nontaxable intangibles "because none of it could be earned absent Nor Cal's franchise, subscriber base, and other intangible assets that make Nor Cal a going concern." However, the Board further noted the extent of such contribution by the nontaxable intangibles "is not ascertainable." Regarding income stream attributable to the possessory interest, the Board indicated it "did not and could not rely on an income approach" for such valuation because of the unavailability of a suitable capitalization rate. Thus, the remaining questions posed by the court could not be answered although the Board noted that use of an income stream of $531,008 (one-third the residual income) and a capitalization rate of 8.744 percent (the overall system rate) results in a possessory interest value substantially equivalent to that arrived at by the Board.

Upon review of this supplemental decision, the court concluded the Board's findings were supported by substantial evidence and denied writ relief. Judgment was entered accordingly.

## II

As an agency of constitutional origin (Cal. Const., art. XIII, § 16; *Kaiser Center, Inc.* v. *County of Alameda* (1987) 189 Cal.App.3d 978, 982 [234 Cal.Rptr. 603]), the Board's factual determinations are entitled to the same deference and respect due a judicial decision. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 36 [112 Cal.Rptr.

---

actually $6,080,710. The parties raise no contentions regarding this apparent computational error. We shall therefore accept the Board's computations for purposes of this appeal.

805, 520 P.2d 29].) Review of a board determination may therefore involve two distinct standards. Where it is claimed the Board applied an improper method of valuing a taxpayer's assets, this presents a question of law. We determine "whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) Where it is claimed instead the Board erroneously applied a proper method of valuation, the decision may be overturned "only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property without due process." (*Ibid.*)

The Assessor challenges the Board's allocation of value to nontaxable intangibles on two grounds. He contends all of the intangibles are taxable either in their own right or as they add value to the possessory interest. He further contends the Board's allocation to intangibles other than the taxable possessory interest was arbitrary and not supported by substantial evidence. These challenges implicate both standards of review.

### III

We first consider the Assessor's claim all intangibles identified by the Board are taxable. Unless exempt under federal or state law, all property in California is subject to taxation according to its value. (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, § 201; *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1451 [262 Cal.Rptr. 439].) " 'Property' includes all matters and things, real, personal, and mixed, capable of private ownership." (Rev. & Tax. Code, § 103.) Real property includes any possessory interest in real property which is defined as any right to possession of land, except where coupled with actual ownership of the land, or taxable improvements on tax-exempt land. (Rev. & Tax. Code, §§ 104, 107.)

The Board acknowledged and allocated value to four intangibles: right to do business, possessory interest, going concern value, and subscriber list. It is undisputed Nor Cal's possessory interest in the public rights-of-way for transmission of its service is taxable. (*Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368, 378 [229 Cal.Rptr. 839].) However, the right profitably to use public easements is not the only intangible asset obtained by Nor Cal by virtue of its franchise rights. Franchises such as those at issue here consist of two primary components: "the right to use the public streets to lay the cables and the right to charge a fee to subscribers for their use of the cable facilities." (*County of Stanislaus* v. *Assessment Appeals Bd., supra,* 213 Cal.App.3d at p. 1452.)

■ The right to do business has been recognized as an intangible asset exempt from property taxation. (*County of Stanislaus* v. *Assessment Appeals Bd., supra,* 213 Cal.App.3d at p. 1454.) The Assessor nevertheless contends Nor Cal's right to engage in a cable television business has no value because this is a right available to anyone and only has meaning when coupled with a right to use the public easements. This argument is frivolous. If it is open to anyone to conduct a cable television business, it is also open to anyone to use the public easements for this purpose. The two rights are concomitant and follow from the acquisition of a franchise. (*Id.* at p. 1452.) Obviously the Assessor would not argue the right to use public easements has no value merely because this right is open to everyone.

Cable operators "pay local entity franchise fees up to 5 percent of their gross receipts for the privilege of operating their businesses. They also are subject to income tax on their corporate franchise earnings under the Bank and Corporation Tax Law (pursuant to Cal. Const., art. XIII, § 27). Thus, it would be discriminatory to tax their right to engage in the cable television business under the property tax laws." (213 Cal.App.3d at p. 1454.)

Nor Cal's general right to do business is further enhanced by favorable franchise terms identified by Kane. These Kane defined as terms of the franchises making them more economical than typical cable franchises. For example, Nor Cal is not required to fund a local public access corporation or provide service to low density areas. By concluding these favorable terms have no value separate from the right to do business, the Board effectively concluded they were subsumed within, and enhanced the value of, Nor Cal's right to do business. Thus, the Assessor's contention the right to do business had no separate value is unavailing.

■ The Assessor also disputes separate valuation for the subscriber list and going concern value. According to the Assessor, neither item exists separate from the possessory interest. However, regardless of the label used, the record contains substantial evidence Nor Cal had value apart from the franchise and tangible assets. According to Kane, Nor Cal had value by virtue of the integration of the various elements of the business. These elements he described as including "business and technical procedures, accounting and billing systems, programming contracts, FCC licenses (5) and relationships with local advertisers." Nor Cal also had a trained work-force in place and procedures for operating its business.

At the time of purchase by Continental, Nor Cal had a customer base of 26,075 basic subscribers out of 34,162 homes passed, or a 76 percent saturation rate. There were also 10,675 total pay channel units. Kane indicated this saturation rate was higher than average. The Assessor cannot

reasonably argue this customer base had no value to Nor Cal separate from use of the possessory interest. Were this true, a cable system with no customers would be as valuable as a comparably sized system with many customers. Admittedly, the customers are of no value without the possessory interest. However, the converse is also true. Thus, whether labeled a subscriber list, going concern value, or enterprise value, the record amply supports the existence of value attributable to the operational nature of Nor Cal. The question to be resolved therefore is not whether these assets have value, for clearly they do. We must decide, instead, whether value was properly allocated.[5]

## IV

Despite separate existence, the Assessor contends the franchise rights and going concern value of Nor Cal must be subsumed within the possessory interest. According to the Assessor, these assets are no different from other intangible attributes of real property such as location, zoning, view, architecture, etc. which would not be separated from the real property for valuation purposes.

This argument too is frivolous. There is a fundamental distinction between the attributes identified by the Assessor and the intangibles involved in this dispute. Zoning, location and other such attributes relate directly to the real property involved. They are an integral part of and effectively define it. By contrast, intangibles such as going concern value or franchise rights relate to the business being conducted on the real property. They relate to the real property only in their connection with the business using it.

---

[5]Although arguably not applicable to this dispute because its effective date came after the date of purchase, Revenue and Taxation Code section 107.7 provides further support for the separate existence and property tax exemption of the intangible assets recognized by the Board. Subdivision (d) provides: "Intangible assets or rights of a cable television system are not subject to ad valorem property taxation. These intangible assets or rights, include, but are not limited to: franchises or licenses to construct, operate, and maintain a cable television system for a specified franchise term (excepting therefrom that portion of the franchise or license which grants the possessory interest), subscribers, marketing, and programming contracts, nonreal property lease agreements, management and operating systems, a work force in place, going concern value, deferred, startup, or prematurity costs, covenants not to compete, and goodwill. However, a cable television possessory interest may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the cable television possessory interest to beneficial or productive use in an operating cable television system."

This legislation was intended "to clarify the application of existing law and provide uniformity and certainty in the assessment of cable television possessory interests." (Stats. 1988, ch. 1630, § 3, p. 5940.) In *County of Stanislaus* v. *Assessment Appeals Bd., supra*, 213 Cal.App.3d 1445, 1452, footnote 3, the court indicated this section "is not considered a change in the law."

The Assessor nevertheless contends many cases have held intangibles such as involved here do not exist separate from the possessory interest and must therefore be assessed as part of it. In *Scott-Free River Expeditions, Inc. v. County of El Dorado* (1988) 203 Cal.App.3d 896 [250 Cal.Rptr. 504], this court held the right of a commercial rafting outfitter to exclusive commercial use of the flow of water in a river is a possessory interest subject to property taxation. The Assessor contends *Scott-Free* stands for the proposition the right to take a profit from the use of public property cannot be separated from the possessory interest in the property. However, in *Scott-Free* no issue was raised regarding the value to be placed on the possessory interest or whether the commercial rafting outfitter had value distinct from its tangible assets and the possessory interest. The sole issue raised was whether the taxing authority had the power to tax the possessory interest, an issue not disputed here. " '[C]ases are not authority for propositions not considered therein.' " (*Worthley* v. *Worthley* (1955) 44 Cal.2d 465, 472 [283 P.2d 19].)

In *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550], the court indicated: "Intangible values . . . that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property. [Citations.]" (Accord, *Michael Todd Co. v. County of Los Angeles* (1962) 57 Cal.2d 684, 693 [21 Cal.Rptr. 604, 371 P.2d 340]; *ITT World Communications, Inc. v. County of Santa Clara* (1980) 101 Cal.App.3d 246, 257 [162 Cal.Rptr. 186].)

While we agree intangible values *may be reflected* in the value of a possessory interest, it does not follow such values are subsumed as a matter of law. In *County of Stanislaus* v. *Assessment Appeals Bd., supra,* 213 Cal.App.3d 1445, the assessor applied to the board to increase the value of the taxpayer cable television system to $18,350,000. It was argued this value was justified by the effect of nontaxable intangibles on the other assets of the business. The board concluded the intangibles could not be taxed and reduced the assessed value to $5,455,599. The trial court denied relief. (At pp. 1448-1449.)

The appellate court concluded the value of taxable assets may be enhanced by the nontaxable intangible assets. The court explained: "Without the right to put its possessory interest to beneficial or productive use by soliciting subscribers and charging them a fee for transmitting a signal, i.e., the right to engage in business, [the taxpayer's] possessory interest would have little or no market value." (213 Cal.App.3d at p. 1456.) The court

concluded: "In valuing [the taxpayer's] possessory interest on remand, the assessor shall consider the intangible right to do business as required by the above authorities. In so doing, the assessor may impute to the possessory interest an 'appropriate' income from the right to engage in business. [Citation.]" (*Ibid.*)

Significant to this ruling was the appellate court's failure to direct valuation at the full value of the cable system despite a stipulation that such value was $19.4 million. In effect, the court concluded the full value of the intangible right to do business need not be imputed to the possessory interest. Instead, the court remanded to permit the assessor to decide whether and to what extent the value of the possessory interest should be enhanced by the right to do business.

The trial court here did likewise. From the record before it, the court apparently could not determine if and to what extent the Board took into consideration the nontaxable intangibles in computing a value for the possessory interest. The court posed four questions to the Board primarily to clarify this point. In response to the question whether nontaxables were taken into consideration in valuing the possessory interest, the Board indicated: "Nor Cal's possessory interest would be of little or no value if Nor Cal did not also possess non-taxable intangibles such as its subscriber list, the right to operate a cable television business, and going concern value. The Board's $6,072,211 possessory interest value represents the 'in use' value of the possessory interest when put to beneficial and productive use along with and enchanced [*sic*] by Nor Cal's non-taxable intangibles." The Board further explained, in response to a question about the income attributed to the possessory interest: "[T]he income imputed to Nor Cal's possessory interest is $531,008. All of this income is directly related to Nor Cal's non-taxable intangibles because none of it could be earned absent Nor Cal's franchise, subscriber base, and other intangible assets that make Nor Cal a going concern. The converse is also true. The intangible assets enhance the value of each other and none of them standing alone have any substantial value. All of the income of the possessory interest is directly related to and dependent upon the non-taxable intangibles and the taxable tangibles and intangibles. To what extent the income attributable to the possessory interest is directly related to the non-taxable intangibles is not ascertainable." In our view, the record sufficiently establishes the Board considered the effect of intangibles on the value of the possessory interest. It was required to do no more.

## V

The Assessor contends the Board's allocation of value to the right to do business, possessory interest and going concern value is not supported by

substantial evidence. According to the Assessor, the Board's decision to divide the residual into equal proportions was arbitrary and not within the permissible valuation methods. Instead, the Board should have adopted the Assessor's allocation of all residual to the taxable possessory interest.

In proceedings before an assessment board, "the assessing officers are presumed to have properly performed their duties; the taxpayer has the burden of showing that the assessments were not fair and equitable." (*ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d at p. 252; Cal. Code Regs., tit. 18, § 321, subd. (a).) "Revenue and Taxation Code section 1610.8 requires the applicant for a reduction in an assessment to establish the full value of property by *independent evidence.*" (*County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 559 [195 Cal.Rptr. 895], italics in original.)

Of the three intangibles assigned a portion of the residual by the Board, only the possessory interest is taxable. Thus, the Assessor's complaint is with the Board's allocation of only one-third of the residual to the possessory interest. How the Board allocated the other two-thirds is irrelevant.

State Board of Equalization rule 25 enumerates permissible modes of assessing possessory interests. Included are the three methods described earlier, the comparable sales approach, the income approach, and the cost approach. (Cal. Code Regs., tit. 18, § 25.) None of these methods was used by the Board. However, this rule does not purport to be exclusive. It indicates possessory interests "may" be measured by one or more of the enumerated methods.

The Assessor himself acknowledges a cable television possessory interest, "[b]y its nature," may not be measured by one of the approved methods. However, this does not mean, as the Assessor concludes, the full residual value must be apportioned to the possessory interest. As the court in *California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578 [63 Cal.Rptr. 5, 432 P.2d 700], indicated: "When no sound or practicable basis appears for apportionment of income as between enterprise activity and the property itself, then a method may be employed which imputes an *appropriate* income to the property." (*Id.* at p. 584, italics added; accord, *County of Stanislaus* v. *Assessment Appeals Bd., supra,* 213 Cal.App.3d at p. 1455, and cases cited therein.)

Nor Cal relied almost exclusively on the testimony of its expert Kane. Kane determined the intangibles could be separated into six general categories: subscriber list, right to do business, favorable franchise terms, possessory interest, work force and noncompetition agreement. Using an income

approach, Kane allocated an amount to the tangible assets and subscriber list. The remaining income was allocated in equal proportions to the right to do business, favorable franchise terms and possessory interest. After computing a present value for these and the other assets and including an allocation for the noncompetition agreement, the residual value of Nor Cal was assigned to going concern.

The Board adopted Kane's approach to valuing intangibles with certain modifications. First, the Board rejected a separate allocation for favorable franchise terms, treating them instead as part of Nor Cal's right to do business. The Board also rejected Kane's allocation of the residual value to the going concern. According to the Board, going concern should have been assessed equally with the right to do business and possessory interest. Thus, after assigning appropriate amounts to the other assets, the Board allocated the residual one-third to the possessory interest and two-thirds to the remaining intangibles. The Board also allocated one-half of the present value of future franchise fees to the possessory interest and the other half to the right to do business.

In our view this methodology is reasonable and appropriate under the circumstances presented. As previously indicated, the Assessor himself acknowledged none of the traditional methods of valuation was possible. Nevertheless, Kane indicated the possessory interest, right to do business and going concern value operated together to impart value to Nor Cal. None had value independent of the others, while together they had substantial value.

Kane opined the possessory interest contributed approximately one-third of Nor Cal's residual income after deducting that attributable to tangible assets and the customer base. Applying a discount rate of 20 percent, this resulted in an allocation of $4,059,929, which Kane corroborated with an independent valuation based on franchise fees paid.[6] Although Kane attributed the other two-thirds of the residual income to a different mix of intangibles than did the Board, this is of no concern to our analysis. None of these intangibles is taxable. The difference in value attributed to the possessory interest, $4,059,929 by Kane and $6,072,212 by the Board, is also of no moment. This discrepancy reflects merely a different total valuation of the business and different residual value, neither of which is challenged here.

The record also supports the Board's allocation of the present value of future franchise fees. Kane opined the two parts of the franchise, the

---

[6]Using a 50 percent profit margin, which Kane identified as typical in the industry, income attributable to the 5 percent franchise fee was determined. From this, a present value of $4,335,245 was computed.

possessory interest and right to do business, contribute equally to Nor Cal's income stream. Thus, the Board's allocation of value to the possessory interest, and corresponding exclusion from total taxable value for other intangibles, is supported by substantial evidence.

## VI

None of the intangible assets identified by Kane and the Board has value to Nor Cal independent of the others. Each contributes to the total business. On the present record, there is no basis for attributing a higher value to any one of these intangibles and certainly no basis for attributing all value to the possessory interest. On the contrary, the opinions of Nor Cal's expert provide substantial evidence to support the allocation arrived at by the Board. In our view, the Board used an acceptable method of valuation and imputed an "appropriate" value to the possessory interest.

The judgment is affirmed.

Blease, J., and Sparks, J., concurred.

A petition for a rehearing was denied February 24, 1993, and appellant's petition for review by the Supreme Court was denied April 22, 1993. Mosk, J., was of the opinion that the petition should be granted.